**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS**

| | |
|---|---|
| CORNWELL QUALITY TOOLS CO.,<br>667 Seville Road<br>Wadsworth, Ohio 44281<br><br>    Plaintiff,<br><br>v.<br><br>MYRON T. THOMAS<br>1393 Potts Lane<br>Zanesville Ohio 43701<br><br>    Defendant. | Case No.:<br><br>Hon. _____, U.S.D.J.<br><br>Hon. _____, U.S.M.J.<br><br>**COMPLAINT FOR<br>INJUNCTION AGAINST<br>TRADEMARK INFRINGEMENT<br>UNFAIR COMPETITION AND<br>DECEPTIVE TRADE PRACTICES** |

Plaintiff, Cornwell Quality Tools Co., for its Complaint against the Defendant, Myron T. Thomas, states and alleges as follows:

## PARTIES

1.     Plaintiff, Cornwell Quality Tools Co. ("Plaintiff") is a citizen of the State of Ohio, being an Ohio corporation with its office and principal place of business in Wadsworth, Ohio.

2.     Defendant Myron T. Thomas ("Defendant") is a citizen of the State of Ohio, residing in Zanesville, Muskingum County, Ohio.

## JURISDICTION AND VENUE

3.      This is an action for federal trademark infringement, unfair competition, and false designation of origin, and arises under the trademark laws of the United States, namely, Title 15 of the United States Code and, more particularly, 15 U.S.C. § 1114, 15 U.S.C. §§ 1116 - 1118, inclusive; 15 U.S.C. § 1121 and 15 U.S.C. § 1125(a); and related causes of action under the laws of the State of Ohio and common law arising from the wrongful use by Defendant of certain of Plaintiff's registered trademarks as described below.

4.      This Court has original jurisdiction under the provisions of 15 U.S.C. § 1114, 15 U.S.C. § 1121, 15 U.S.C. § 1125(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a), in that the claims arise under the trademark laws of the United States, 15 U.S.C. § 1051, *et seq.*

5.      The Court also has original jurisdiction under 28 U.S.C. §§ 1338(b) with respect to claims arising under common law rights and claims arising under the laws of the State of Ohio, in that such claims are joined with the substantial and related claim under the trademark laws of the United States, 15 U.S.C. §§ 1051, *et seq.*

6.      Supplemental federal jurisdiction is also invoked under 28 U.S.C. § 1367(a) with respect to all other claims that are so related to the claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue for these claims is proper in this Court under 28 U.S.C. § 1391(b) in that Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS

**Cornwell's Trademarks:**

8.    Plaintiff is, and for many years prior to the acts herein complained of has been, engaged in the manufacture and sale in interstate commerce of high-quality precision automotive tools and equipment, more specifically, mechanic's hand-tools and related equipment (the "Products") and the provision of related technical and distribution services (the "Services") under one or more of the following trademarks which are registered in the U.S. Patent and Trademark Office (the "Marks"):

| Mark | Registration No. | Registration Date | Date of First Use in Interstate Commerce |
|---|---|---|---|
|  Cornwell | 747,209 | 3/26/1963 | 1962 |
| CORNWELL | 747,210 | 3/26/1963 | 1920 |
|  | 1,139,026 | 8/26/80 | 1963 |
|  | 1,150,695 | 4/7/81 | 1966 |
|  | 1,163,457 | 8/4/81 | 1972 |

| Mark | Registration No. | Registration Date | Date of First Use in Interstate Commerce |
|---|---|---|---|
| The Choice of Professionals | 1,276,492 | 5/1/84 | 1966 |
| The Choice of Professionals | 1,276,565 | 5/1/84 | 1966 |
| The Choice of Professionals | 2,497,549 | 10/16/01 | 1968 |
| TECH-CREDIT | 2,514,179 | 12/04/2010 | 2001 |
|  | 2,533,695 | 1/29/02 | 1996 |
|  | 3,456,834 | 7/1/08 | 1979 |
|  | 3,470,727 | 7/22/08 | 1996 |
| The Choice of Professionals | 3,494,755 | 9/2/08 | 1979 |
| Cornwell | 3,548,901 | 12/23/08 | 1979 |
|  | 3,855,015 | 6/1/09 | 2009 |
|  | 3,920,502 | 6/1/09 | 2010 |
| Pro Series | 4,449,249 | 12/10/2013 | 2013 |

| Mark | Registration No. | Registration Date | Date of First Use in Interstate Commerce |
|---|---|---|---|
| IBN | 4,645,512 | 11/25/2014 | 2014 |
| IRON MAN BUSINESS NETWORK | 4,649,553 | 12/2/14 | 2014 |
| | 4,898,747 | 2/9/2016 | 1995 |
| CORNWELL CUSTOM | 4,926,021 | 3/29/16 | 2009 |

The Marks have been used continuously in interstate commerce in connection with the Products beginning at least as early as the dates set forth above. Variations of the trade name "Cornwell" have been used in commerce since 1920 and under previous registrations. All of the Marks are currently registered, and most of the registrations are incontestable pursuant to 15 U.S.C. § 1065.

9. The Marks were developed by Plaintiff to distinguish the Products from tools and related items made and sold by others by, among other things, prominently displaying the Marks on the Products themselves, on containers and packaging used for the Products, on trucks and delivery vehicles used with the Products and Services, on uniforms and other forms of identification used by distributors and dealers delivering the Products and Services, with the Products and Services, and in trade and other advertising appearing in journals and periodicals distributed throughout the United States.

10.    Plaintiff's Products and Services are sold primarily to the professional mechanics' tools market, through independent dealers, such as Defendant, who purchased the Products and Services from Plaintiff.

11.    High-quality precision mechanics' automotive tools and equipment and related Services sold under the Marks are recognized by virtually all members of the mechanics' automotive tools and equipment market as being Plaintiff's Products and Services originating from Plaintiff.

12.    Plaintiff has used the Marks continuously on and/or in connection with the Products and Services since their respective inception, and each have acquired strong secondary meaning as being indicative of the source of high-quality, precision mechanics' automotive tools and equipment and related Services.

13.    As a result of Plaintiff's expenditure of a considerable amount of money and continuously marketing its Products and Services in connection with the distinctive and familiar Marks, the consuming public has come to recognize all mechanics' tools and related items and Services sold in connection with the Marks as originating from or otherwise approved or sponsored by or affiliated or connected with Plaintiff.

14.    On or about July 7, 2009, Plaintiff and Defendant entered into a written agreement entitled Cornwell Quality Tools Company Dealer Franchise Agreement ("Dealer Agreement"). A true and correct copy of the Dealer Agreement between Plaintiff and Defendant is attached as Exhibit "A," and incorporated by reference. The Dealer Agreement provided that Defendant was to have a non-exclusive dealership of Plaintiff's Products and Services. Pursuant to the terms of this Dealer Agreement and through such relationship, Defendant distributed

Plaintiff's Products and Services bearing the Marks and had the non-exclusive right to use the Marks in connection with the distribution of said Products and Services, including use of the Marks in sales and promotional materials, on delivery trucks, uniforms, containers, packaging and other items used in connection with the distribution of the Products and Services.

15.     Under the Dealer Agreement, Plaintiff agreed to sell and Defendant agreed to buy tools and market and sell Plaintiff's Products and Services in part of East Central Ohio, as set forth in the map following page 6 of the Dealer Agreement.

16.     In the Dealer Agreement, at Page 3, Paragraph 10. Defendant recognized the validity of the Marks, agreed that he did not have, nor would acquire, any interest in the Marks. Defendant further agreed not to do anything that would impair Plaintiff's rights, title or exclusivity in the Marks.  The Dealer Agreement also provided in pertinent part at Pages 5-6, Paragraph 17:

> Upon termination, Dealer [Defendant] shall immediately discontinue use of the marks and shall immediately remove all reference to the marks by way of signs or otherwise and any terms confusingly similar from its property and Dealer [Defendant] shall discontinue reference to the marks from its advertising media. It is understood and agreed by Dealer [Defendant] that, upon termination, all rights pertaining to the marks shall automatically revert to Cornwell.

**Defendant's Infringing Conduct:**

17.     On February 22, 2016, Plaintiff sent Defendant a Notice of Intended Termination of Defendant' Dealer Agreement, to be effective on March 28, 2016, if the stated defaults were not cured.  A true and correct copy of the notice is attached as Exhibit B and incorporated by this reference.  The defaults were not cured and the termination became effective on March 28, 2016.

18.     As a result, under Paragraph 17 of the Dealer Agreement, all of Defendant' non-exclusive rights to use the Marks terminated as of March 28, 2016.  Defendant was advised that after that date, he must cease to hold himself out as a Cornwell dealership and must remove all uses of the Cornwell trade name and trademarks from his truck, clothing, stationery, business cards, etc.

19.     Defendant nevertheless continued to use the Marks in the sale of his inventory of tools and related equipment, without Cornwell's knowledge or consent.  Upon learning of the infringement, demand that Defendant cease and desist was immediately sent to Defendant by Cornwell's counsel, on April 19, 2016.  A true and correct copy of the demand letter is attached as Exhibit C and is incorporated by reference.

20.     Defendant in response stated in a telephone conversation that he would enter into an agreement to remove the Marks by a specified date in order to give him the opportunity to market his truck with the Marks still on it for sale to other Cornwell dealers.  Such an agreement was sent to him on April 21, 2016.

21.     But Defendant never returned the signed agreement and on or about June 3, 2016, he stated that he refused to do so and would not remove the Marks.  *Consequently, unless enjoined, Defendant may well sell the truck with the Marks to a third party other than a Cornwell dealer, who may likely then operate the truck in commerce with the Marks, giving the misimpression that the third party is affiliated with Cornwell.*  Cornwell would then be forced to try to find the third party and seek enforcement of the Marks against it.  Since such trucks are marketed nationally online, the third party buyer could be anywhere in the country.

8

22.     On information and belief, Defendant is thus continuing to use the Marks and is engaging in other infringing business practices in an attempt to pass his products off as if they are Plaintiff's and in a manner calculated to deceive Plaintiff's customers and members of the general public, or to create the likelihood that a third party will do so.  A copy of a photograph taken of Defendant's truck on April 19, 2016, showing his continuing use of the Marks is attached as Exhibit D.  Defendant has utilized Plaintiff's Marks to divert Plaintiff's business and in an effort to make his business and products confusingly similar to Plaintiff's business and products.

23.     The natural, probable and foreseeable result of Defendant's wrongful misconduct, as alleged above, has been to deprive Plaintiff of the benefits of using, selling, and licensing its Marks.  Plaintiff has also suffered a substantial loss of goodwill.  Defendant's conduct has also created a likelihood of confusion between Plaintiff's products and Defendant's products or those of a third party, and has injured Plaintiff's relations with present and prospective customers.

24.     On information and belief, Plaintiff alleges that unless enjoined by this Court, Defendant intends to continue his course of conduct and to wrongfully use, infringe upon, and otherwise profit from Plaintiff's Marks.

25.     As a direct and proximate result of the acts alleged above, Plaintiff has already suffered irreparable injury, and lost profits.  Plaintiff has no adequate remedy at law to redress all of the injuries that Defendant has caused and intends to cause by his conduct.  Plaintiff will continue to suffer irreparable damage and injury until Defendant's actions alleged above are enjoined by this Court.

## FIRST CLAIM FOR RELIEF

### (Infringement of Federally Registered Trademarks - 15 U.S.C. § 1114)

26.     Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-25 of this Complaint as if fully set forth.

27.     The actions of Defendant described herein constitute infringement of the Marks in violation of Section 32(b) of the Lanham Act, 15 U.S.C. § 1114.  Despite termination of Defendant's Dealer Agreement, and letters to Defendant notifying Defendant that he no longer had any rights whatsoever to continue to use the Marks, and despite threat of legal action, Defendant continues to so use the Marks without authorization in connection with Defendant's promotion and distribution of Defendant's goods and services in and affecting interstate commerce.

28.     Defendant's goods and services sold in connection with the Marks are sold in and/or otherwise affect interstate commerce to the same consuming public and travel through the same trade channels as Plaintiff's Products and Services.

29.     Defendant's goods and services sold in connection with the Marks are identical to and compete directly with Plaintiff's Products.

30.     Defendant has willfully and knowingly infringed and will continue to further infringe the rights of Plaintiff and its federally registered Marks, in violation of 15 U.S.C. § 1114, as a result of the continued, unauthorized use of the Marks, with the intention of deceiving and misleading the consuming public, and by wrongfully trading on the goodwill and reputation of Plaintiff.

31. The use by Defendant of the Marks is likely to cause confusion or mistake or deception of purchasers as to the source, origin, sponsorship, affiliation, approval or connection of Defendant's and Plaintiff's goods and services.

32. By his wrongful acts, Defendant has caused and is likely to continue to cause great injury and damage to Plaintiff which cannot now be accurately computed and, unless restrained by the Court, Defendant will continue to cause irreparable injury and damage to Plaintiff and to the goodwill associated with Plaintiff's Marks.

33. Due to Defendant's prior agreement with Plaintiff, and the notices sent to Defendant, Defendant knew or should have known that he had no legal basis to use Plaintiff's Marks. Despite this knowledge, Defendant willfully and deliberately infringed on Plaintiff's Marks.

34. As a result of Defendant's willful and deliberate infringement of Plaintiff's Marks, Plaintiff requests judgment granting preliminary and permanent injunctions, together with its costs of suits and reasonable attorney's fees pursuant to 15 U.S.C. § 1117(b).

## SECOND CLAIM FOR RELIEF

### (False Designation of Origin and Unfair Competition under the Lanham Act – 15 U.S.C. § 1125(a))

35. Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-34 of this Complaint as if fully set forth.

36. After March 28, 2016, Defendant's use of the Marks and/or or substantially similar Marks in connection with the promotion and distribution of his goods and services in commerce has caused or is likely to cause confusion, mistake and deception among consuming public as to the origin, sponsorship, and/or approval of the Defendant's products and services.

37.     As a result of Defendant's intentional, wrongful acts, purchasers have purchased or are likely to purchase Defendant's goods and services bearing the Marks thereby injuring Plaintiff by diversion of sales to Defendant.

38.     Plaintiff has no control over the quality of the goods and services sold by Defendant and, because of the confusion as to the origin, sponsorship or approval of the Defendant's goods and services engendered by Defendant, Plaintiff's extensive and valuable goodwill is at the mercy of the Defendant, and Plaintiff will suffer irreparable harm should such false representation be allowed to occur.

39.     Such acts by Defendant were willful and deliberate, and designed to specifically trade upon the enormous and valuable goodwill of Plaintiff.

40.     By his wrongful acts, Defendant has caused and will continue to cause great harm and damage to Plaintiff which cannot now be assessed or computed and, unless restrained by the Court, will continue to cause irreparable injury and damage to Plaintiff and to the goodwill associated with the Marks.

41.     As a direct and proximate result of the foregoing, Plaintiff has and will continue to suffer damages according to proof at trial. Consistent with 15 U.S.C. § 1117(a), among other remedies, Plaintiff is entitled to injunctive relief.

42.     Due to Defendant's prior agreement with Plaintiff, and the notices sent to Defendant, Defendant knew or should have known that he had no legal basis to use Plaintiff's Marks. Despite that knowledge, Defendant willfully violated 15 U.S.C. § 1125(a).

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

43.    Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-42 of the Complaint as if fully set forth.

44.    This claim arises under the principles of equity concerning unjust enrichment and misappropriation of rights.

45.    Plaintiff has expended a considerable amount of time, money and effort developing and promoting the Marks for Plaintiff's Products and Services.

46.    Until recently, Defendant had a non-exclusive dealership of Plaintiff's Products and Services. Through such relationship, Defendant has received from Plaintiff and distributed to Defendant's customers sales and promotional material as well as Plaintiff's goods and services bearing the Marks.

47.    Through its relationship with Plaintiff, Defendant acquired actual knowledge that the consuming public recognizes mechanics' tools and related items sold under Marks as emanating from Plaintiff.

48.    The unauthorized use of the Marks by Defendant for his goods and services has caused and is likely to cause confusion with Plaintiff's Products and Services bearing the Marks.

49.    Defendant has acted unfairly in using the Marks.

50.    Defendant has taken and will continue to take unfair advantage of the goodwill and business value developed by Plaintiff in the Marks.

51.    Defendant has misappropriated and will continue to misappropriate and illegally exploit the valuable property rights and goodwill of Plaintiff and its Marks. As a result of such misappropriation, Plaintiff will suffer irreparable injury to its property and goodwill, and

Defendant will be unjustly enriched thereby to the detriment of Plaintiff, entitling Plaintiff to injunctive relief and its costs of suit.

## FOURTH CLAIM FOR RELIEF
### (Deceptive Trade Practices under Ohio Revised Code Chapter 4165)

52.     Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-51 of this Complaint as if fully set forth.

53.     The actions of Defendant described herein constitute deceptive trade acts and practices in violation of Ohio law, specifically Ohio Revised Code Sections 4165.01 et seq. Without authorization, Defendant has intentionally sold and advertised his goods and services under the Marks so as to pass off his goods and services as those of Plaintiff, to confuse and deceive purchasers as to the source, sponsorship, approval or certification of, or the affiliation, connection or association with Defendant's goods and services; and to obtain the acceptance of Defendant's goods and services based on the reputation and good will of Plaintiff and its high-quality Products and Services sold in connection with the Marks.

54.     As a direct and proximate result of Defendant's wrongful conduct, Defendant has caused and will cause confusion, mistake and deception among the purchasing public as to the source of Defendant's goods and services and Defendant has received and will continue to receive sales and profits generated from the strength of Plaintiff's success, goodwill and customer recognition. As a result of these acts of infringement and unfair competition, Plaintiff has suffered and will continue to suffer irreparable injury and damage to its business relationships with its current and prospective customers, including but not limited to lost profits, lost reputation and loss of goodwill.

55.     Plaintiff is accordingly entitled to injunctive relief.

### FIFTH CLAIM FOR RELIEF
**(Common Law Trademark Infringement and Unfair Competition)**

56.    Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-55 of this Complaint as if fully set forth.

57.    Plaintiff has used the Marks in connection with the distribution and sales of the Products and Services in Ohio and throughout the United States and, as such, Plaintiff owns and enjoys common law rights in Ohio and throughout the United States in and to the Marks which are superior to any rights which Defendant may claim in and to the Marks in any form or style with respect to the manufacture, sale and distribution of mechanics' tools and related goods and services.

58.    Use of the Marks by Defendant in connection with the manufacture, sale and distribution of Defendant's goods and services in the State of Ohio and elsewhere throughout the United States has caused and is likely to cause confusion as to the source of Defendant's goods and services in that the purchasers thereof have associated or will be likely to associate Defendant's goods and services with and as originating from or being sponsored or approved by or affiliated or connected with Plaintiff, to the detriment of Plaintiff.

59.    As a result of these acts of infringement and unfair competition by Defendant, Plaintiff has suffered and will continue to suffer irreparable injury to its reputation and goodwill, entitling it to injunctive relief and its costs of suit.

### SIXTH CLAIM FOR RELIEF
**(Breach of Contract)**

60.    Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-599 of this Complaint as if fully set forth.

61.     Under the Dealer Agreement, Plaintiff agreed to sell and Defendant agreed to buy tools so as to market and sell Plaintiff's Products and Services in the area of Ohio set out in Section 1 of the Dealer Agreement.

62.     Under Section 5 of the Dealer Agreement, Defendant recognized the validity of the Marks, agreed to have no interest in the Marks, and agreed to do no act that would impair Plaintiff's rights in the Marks, and that after termination of the Dealer Agreement, Defendant would cease all use of the Marks.

63.     Under Paragraph 17 of the Dealer Agreement, as a result of the termination of Defendant's Dealer Agreement, all of Defendant's non-exclusive rights to use the Marks immediately terminated.

64.     Despite such termination and letters to Defendant notifying Defendant that he no longer had any rights whatsoever to continue to use the Marks, and despite threat of legal action, Defendant continues to so use the Marks without authorization in connection with Defendant's promotion and distribution of Defendant's goods and services in and affecting interstate commerce.

65.     Plaintiff has performed all conditions and covenants Plaintiff is required to perform under the Dealer Agreement, except those excused by Defendant's conduct.

66.     As a proximate result of Defendant's breach of the Dealer Agreement, Plaintiff has and will suffer irreparable damage and injury, entitling it to injunctive relief and its costs of suit.

## SEVENTH CLAIM FOR RELIEF
### (Preliminary and Permanent Injunction)

67.     Plaintiff realleges and incorporates by this reference each and every allegation contained in paragraphs 1-666 of this Complaint as if fully set forth.

68.     Beginning on or about March 28, 2016, the effective date of the termination of the Dealer Agreement, and continuing to the present time, Defendant wrongfully and unlawfully used Plaintiff's Marks without authorization in connection with Defendant's promotion and distribution of Defendant's goods and services and in interstate commerce.

69.     Despite letters to Defendant notifying Defendant that he no longer has any rights whatsoever to continue to use the Marks, and despite threat of legal action, Defendant has refused and still refuse to refrain from his conduct.

70.     Defendant's wrongful conduct, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiff in that Defendant's continued use of Plaintiff's Marks will deceive and mislead the consuming public and will cause harm to the goodwill and reputation of Plaintiff.  Defendant's conduct will further cause confusion, mistake and deception of the consuming public and will result in dilution of the Marks and diversion of sales from Plaintiff.

71.     Plaintiff has no adequate remedy at law for the injuries currently being suffered. It will be impossible for Plaintiff to determine the precise amount of damage that it will suffer if Defendant's conduct is not restrained and, Plaintiff may be forced to institute a multiplicity of actions to obtain adequate compensation for its injuries.

72.     Plaintiff seeks a preliminary and permanent injunction restraining and enjoining Defendant, his agents, servants, employees, successors and assigns and all others acting in concert or participation with them as follows:

a.      From infringement of Plaintiff's Marks (U.S. Trademark Registration Numbers 747,209; 747,210; 1,276,565; 1,276,492; 1,163,457; 1,150,695; 1,139,026; 2,497,549; 2,514,579; 2,533,695; 3,456,834; 3,470,727; 3,494,755; 3,548,901; 3,855,015; 3,920,502; 4,449,249; 4,645,512; 4,649,553; and 4,926,021) through the display of said Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise infringing upon Plaintiff's Marks;

b.      From unfairly competing with Plaintiff through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise unfairly competing with Plaintiff;

c.      From engaging in unfair and deceptive trade practices through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise engaging in unfair and deceptive trade practices;

d.    From infringing upon and competing unfairly with Plaintiff with respect to its common law and state rights in the Marks through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise infringing upon and competing unfairly with Plaintiff with respect to its common law and state rights in the Marks;

e.    From dilution of Plaintiff's Marks through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise diluting Plaintiff's Marks;

f.    From injuring Plaintiff's business reputation through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise injuring Plaintiff's business reputation;

g.    From leading anyone to believe or representing, either orally or in writing, that Defendant is Plaintiff's dealer or distributor or otherwise professionally affiliated or associated with Plaintiff;

h.    For an order to surrender for destruction all decals, labels, stationery, business cards, invoices, packaging, containers, advertising materials,

uniforms or any other business equipment or marketing materials which displays Plaintiff's Marks; and

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief against Defendant Myron T. Thomas as follows:

1.     Judgment that Plaintiff's Trademarks have been infringed and/or diluted by Defendant' willful and deliberate actions under 15 U.S.C. §1114, 15 U.S.C. §1123(c)(1) and Federal Common Law;

2.     Judgment that Defendant has committed deceptive trade practices against Plaintiff in violation of Ohio Revised Code Sections 4165.01 et seq.

3.     Judgment that Defendant, and his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, be enjoined preliminarily and permanently:

   a.     From infringement of Plaintiff's Marks (U.S. Trademark Registration Numbers 747,209; 747,210; 1,276,565; 1,276,492; 1,163,457; 1,150,695; 1,139,026; 2,497,549; 2,514,579; 2,533,695; 3,456,834; 3,470,727; 3,494,755; 3,548,901; 3,855,015; 3,920,502; 4,449,249; 4,645,512; 4,649,553; and 4,926,021) through the display of said Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant' vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise infringing upon Plaintiff's Marks;

   b.     From unfairly competing with Plaintiff through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of

decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise unfairly competing with Plaintiff;

c.    From engaging in unfair and deceptive trade practices through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise engaging in unfair and deceptive trade practices;

d.    From infringing upon and competing unfairly with Plaintiff with respect to its common law and state rights in the Marks through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise infringing upon and competing unfairly with Plaintiff with respect to its common law and state rights in the Marks;

e.    From dilution of Plaintiff's Marks through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise diluting Plaintiff's Marks;

f.    From injuring Plaintiff's business reputation through the display of Plaintiff's Marks by requiring the complete obliteration of all Marks in the

form of decals or otherwise from Defendant's vehicle, stationery, business cards, invoices, packaging, containers, advertising, uniform or any other business equipment or marketing materials, or otherwise injuring Plaintiff's business reputation;

g.    From leading anyone to believe or representing, either orally or in writing, that Defendant is Plaintiff's dealer or distributor or otherwise professionally affiliated or associated with Plaintiff;

h.    For an order to surrender for destruction all decals, labels, stationery, business cards, invoices, packaging, containers, advertising materials, uniforms or any other business equipment or marketing materials which displays Plaintiff's Marks; and

**On All Claims for Relief:**

For an award of costs and reasonable attorney fees and such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**RODERICK LINTON BELFANCE LLP**

/s/ Robert M. Gippin
Robert M. Gippin (0023478)
50 S. Main Street, 10th Floor
Akron, Ohio 44308
Phone: (330) 315-3400
Fax: (330) 434-9220
E-mail: rgippin@rlbllp.com

Attorneys for Plaintiff

8019
07/27/09

**Myron "Troy" Thomas**
Hack      OH

# CORNWELL QUALITY TOOLS COMPANY



DFA0708
# DEALER FRANCHISE AGREEMENT



**EXHIBIT**

A



# DEALER FRANCHISE AGREEMENT

THIS DEALER FRANCHISE AGREEMENT ("Agreement") made this ___27th___ day of

___July___ 2009, by and between THE CORNWELL QUALITY TOOLS COMPANY
Of Wadsworth, Ohio ("Cornwell"), and ___Myron "Troy" Thomas___ of

___2965 Darlington Drive___ Residence ___Zanesville___ City ___OH___ State

___43701___ Zip, and his or her spouse as active partners in the operation of the
franchise (individually and/ or collectively referred to as "Dealer")

## RECITALS

A.    Cornwell represents that it is a manufacturer and distributor of various tools and
other items of use in the automotive repair business (the "Products").

B.    Cornwell desires to grant to the Dealer a franchise to purchase and resell the
Products with primary responsibility on Dealer's part to serve the automotive
aftermarket in the area defined below (the "Territory") and the Dealer desires to serve
in such capacity.

In consideration of the mutual promises set forth, the Dealer and Cornwell agree as
follows:

1.    Cornwell grants to the Dealer the right, and the Dealer undertakes the
obligation, upon the terms set forth in this Agreement, to operate a franchise selling
the Products in the Territory described as follows:

### See attached map for details

This Agreement shall continue until terminated, as set forth in Paragraphs 13, 14,
and 16 below.

2.    Cornwell agrees to sell dealer products in such quantities as Dealer requires
and at such prices as Cornwell may determine from time to time.

1

3.    Upon execution or within 30 days of this Agreement, the Dealer agrees to place an order for an initial inventory of Products from Cornwell with a total regular dealer net price of $_____ (the "Starter Inventory").  Cornwell must approve the Starter Inventory order.  Cornwell will recommend a list of Products, which would be useful for the Dealer in beginning its operation.

4.          a. The Dealer agrees to pay for the Starter Inventory in either of the following ways:  (1) by paying Cornwell the full amount of the regular dealer net price of the products ordered in cash upon execution of the Agreement; or (2) upon prior written approval of Cornwell, with a combination of cash and note.

4.          b. Unless waived by Cornwell, the Dealer further agrees to deposit **$15,000**, as a reserve with Cornwell, at the time payment is made for the Starter Inventory ("the Reserve").  The Dealer agrees to pay for the Reserve in either of the following ways:  (1) by paying Cornwell the full amount of the Reserve in cash upon execution of the Agreement; or (2) upon prior written approval of Cornwell, included with note for the balance.

4.          c. The Reserve shall be applied by Cornwell to the Dealer's open account, as a credit against the Dealer's further purchases of inventory, in a weekly amount equal to 60% of the increase in the Dealer's documented Time Payment (TP) Account balance over the preceding week.   The Reserve shall be maintained by Cornwell until it is exhausted or this Agreement is terminated, whichever occurs first.  If the Reserve is funded with a combination of cash and notes, the cash deposited will be applied first against the further purchases of inventory. The funds remaining in the Reserve shall be refunded if paid in cash or, if borrowed, credited at the Dealer's option to the Dealer's open account or as a voluntary pre-payment under paragraph 1(c) of the Dealer's note, if the Reserve has not been used in full upon the termination of this Agreement.  When the Reserve is established, it shall be credited by Cornwell with a lump-sum amount reflecting interest on the cash portion of the Reserve at the then-applicable rate for Cornwell's overnight bank sweep accounts and the assumption that the Reserve will be drawn down evenly over **52** weeks, plus a lump-sum amount reflecting interest for **52** weeks on the borrowed portion of the Reserve at the same rate as the Dealer's note.  Any unearned interest may be recovered by Cornwell if the Reserve ends with a remaining balance.

4.          d. Unless waived by Cornwell, the Dealer further agrees that the Dealer will provide verification to Cornwell, at the time payment is made for the Starter Inventory and Reserve, that as of that date the Dealer has **at least an additional $4,000** deposited in usable funds in a business checking account at a financial institution of the Dealer's choice and the Dealer further agrees that the Dealer will only use those funds for the business purposes of the dealership, which may include a reasonable draw for personal living expenses, as agreed upon by Cornwell in advance, while this Agreement is in force.

5.    The Dealer agrees to acquire and/or use in the operation of its franchise a display truck or van which has been approved by Cornwell, an IBM-compatible computer meeting specifications set by Cornwell, **high speed Internet access, via cable, DSL or high speed cellular** and the "MM1Plus" Software for Cornwell dealers, under a Service Contract with Classic Computer Systems.  The Dealer agrees to submit data generated by the computer system, including but not limited to the weekly reports, as Cornwell directs.

6.    Dealer agrees to carry the following minimum insurance coverages:  commercial business auto liability insurance with limits of $1,000,000; general commercial liability insurance under a comprehensive general liability form that includes coverage for bodily harm, property damage, and product liability policy limits not less than $1,000,000; and cargo insurance with all risk property coverage for full replacement value of Dealer's inventory.  Dealer agrees to include Cornwell as "loss payee" and "additional insured" on the Dealer's cargo insurance policy, to the extent of Cornwell's security interest in Dealer's inventory.

7.    Commencing at the end of the first six months after the franchise agreement is signed, the Dealer agrees to maintain average weekly purchases from Cornwell equal to at least 80% of the national average of Cornwell franchise dealers' weekly purchases during the current calendar year.  Every week, Cornwell calculates the national average franchise dealer weekly purchase amount during the current year. (Total dealer year to date purchases less initial loadout purchases, divided by the number of weeks to date, then divided by the number of dealers at the end of the week prior to the current week.)  Each week, Dealer agrees to maintain average weekly purchases (year to date purchases divided by the number of weeks to date) equal to 80% of Cornwell's national weekly average for franchise dealers.

8.    a. Cornwell will make available to the Dealer combined formal and informal training opportunities depending on the individual requirements and background of the Dealer.  This training will include a mandatory two (2) weeks in the first month in which the Dealer is in operation, during which a Cornwell District Manager will accompany Dealer on Dealer's route and train Dealer.

8.    b. Before Dealer begins selling Cornwell product from Dealer's truck or van, Cornwell will provide Dealer with at least 34 hours of mandatory initial classroom training (MM1 New Dealer Training Program) near Cornwell's corporate offices in Wadsworth, Ohio.  Dealer must complete the MM1 New Dealer Training Program before operating the dealership.  The MM1 New Dealer Training Program will include classroom instruction on basic business procedures, computer setup, MM1 setup, customer relations, products warranty/repair, Cornwell CDL and Dealer Business System.  Dealer must pay the cost of travel, food, lodging and any other incidental costs for the MM1 New Dealer Training Program.

9.    Dealer agrees to personally participate full time in the direct operation of the Dealership.  Dealer further agrees to operate only one truck in the territory described in Paragraph 1.

3

10. The Dealer shall display the Cornwell Trademarks ("Marks") in the location, style and manner specified by Cornwell. No other trademarks shall be used or employed by Dealer on or in connection with the Cornwell Products except as specified in writing by Cornwell. It is expressly understood and agreed that the Marks shall not be employed as, or included in, the trade name or trade style of Dealer either during the life of this Agreement or subsequently thereto.

Dealer recognizes the validity and Cornwell's exclusive ownership of the Marks. Dealer agrees that it will not do any act or thing, either directly or indirectly, that may in any way impair Cornwell's title and exclusivity. Dealer further agrees that during the continuance of this agreement, or at any time thereafter, it does not have and may not claim any right to use, any right, title, or interest in, and may not register with any Governmental authority any trademark, identical with or similar to the Marks without the prior written consent of Cornwell.

Dealer further acknowledges that nothing in this Agreement, and no use of any of the Marks under the terms of this agreement, shall create in Dealer any right, title or interest in any of the Marks. Dealer shall take such steps and execute such further documents as Cornwell may reasonably request in order to protect Cornwell's complete interest in and ownership of the Marks.

Dealer agrees to notify Cornwell immediately when it learns about an infringement of or challenge to its use of Cornwell's trademark. Cornwell will take the action it thinks appropriate. While Cornwell is not required to defend the Dealer against a claim against its use of the trademark, Cornwell will reimburse Dealer for its liability and reasonable costs in connection with defending Cornwell's trademark. To receive reimbursement, the Dealer must have notified Cornwell immediately upon learning about the infringement or challenge.

Dealer must modify or discontinue the use of a trademark if Cornwell modifies or discontinues it. In the event of such action by Cornwell, Cornwell will reimburse the Dealer for tangible costs of compliance (for example, changing decals or signs). The Dealer agrees not to directly or indirectly contest Cornwell's right to its trademarks, trade secrets or business techniques that are a part of Cornwell's business.

11. The franchise granted by this Agreement is assignable or transferable by Dealer, either voluntarily or by operation of law, only with written consent from Cornwell. Cornwell will not unreasonably withhold its consent. Dealer shall have the right to assign or transfer Dealer's assets, subject to any security interest Cornwell may have in them. Upon the death or disability of Dealer, Cornwell may authorize a succession of ownership within the Dealer's family when the proposed successor has been previously active in the Dealer's business. Cornwell reserves the right to assign or transfer its rights, duties or obligation under this agreement.

4

12.   Cornwell guarantees that products manufactured by Cornwell ("Cornwell Hard Line") will be free of defects in material and workmanship, and that the Cornwell Hard Line products will conform to the description given them by Cornwell.  If there are imperfections, any such products will be repaired or replaced without charge upon being returned to the Distribution Services Company, 635 Seville Road, Wadsworth, Ohio 44281.   The Dealer agrees to extend this same warranty to the Dealer's customers.

Cornwell further extends manufacturers' warranties to its dealers on products supplied to Cornwell and re-sold to its dealers ("Cornwell Allied Line").   The Dealer agrees to extend this same warranty to the Dealer's customers.

13.   In the event of default caused by the following (and except as required under applicable laws): (1) breach of promises contained in the Agreement, including but not limited to (a) the Dealer's failure to pay as agreed for merchandise delivered by Cornwell or (b) to maintain the inventory purchase levels required in Paragraph 7 or (c) to display Cornwell's trademarks and to refrain from their misuse; (2) Dealer is convicted of a felony; (3) a voluntary or involuntary proceeding is instituted against Dealer in bankruptcy or other similar laws; (4) A Receiver is appointed for the assets of Dealer; or (5) Dealer makes an assignment for the benefit of Dealer's creditors, this Agreement may be declared terminated by Cornwell by notice in writing effective immediately upon receipt.

14.   Dealer shall have 30 days to cure default caused by failure to pay as agreed for merchandise delivered and/or failure to maintain the inventory purchase levels required in Paragraph 7.

15.   Cornwell may agree to waive any default, in its sole discretion.  No action or failure to act on the part of Cornwell shall operate as a waiver or otherwise of the subsequent right to terminate Dealer, unless expressly so stated in writing.

16.   Dealer may terminate this Agreement at any time after mailing written notice to Cornwell thirty (30) days before the effective date of such termination.  In addition to its rights under Paragraph 13 above, Cornwell may terminate this Agreement at any time five years or more after the date of this Agreement, in the event that Cornwell ceases generally from the business of selling the Products in the State in which the Territory is located.  Cornwell shall give at least one (1) year's notice in writing of such termination and shall not offer franchises again to sell the Products in the State for at least five (5) years thereafter.

17.   In the event of termination of this Agreement for any reason, or upon the death or disability of Dealer, Cornwell agrees to purchase from Dealer, or Dealer's estate, all unused and undamaged merchandise currently sold by Cornwell at the then prevailing Dealer prices, less a fifteen percent (15%) restocking charge.  All such tools must be shipped freight prepaid to the Wadsworth Distribution Center, 635 Seville Road, Wadsworth, Ohio 44281, Attn: Returns Dept. within thirty (30) days.

5

Upon termination, Dealer shall immediately discontinue use of the Marks and shall immediately remove all reference to the Marks by way of signs or otherwise and any terms confusingly similar from its property and Dealer shall discontinue reference to the Marks in its advertising media. It is understood and agreed by Dealer that, upon termination, all rights pertaining to the Marks shall automatically revert to Cornwell.

Cornwell will apply any or all monies to be paid for assets purchased from a terminated Dealer as may be necessary to discharge terminated Dealer's total indebtedness to Cornwell. Should there be a deficiency in the purchased assets, any balance remaining due to Cornwell will be payable immediately. The term "indebtedness" shall include both matured and unmatured obligations, and upon termination Cornwell may declare all promissory notes held or later acquired by it against Dealer immediately due and payable at any time.

18. This Agreement supersedes all agreements, written or oral, and previous and contemporaneous, to date between Dealer and Cornwell. No modification or amendment of this Agreement shall be effective unless made in writing and signed by a representative of Cornwell and Dealer.

19. Any provision of this agreement at variance with the laws of any State or Territory in which it is or becomes operative, or of the United States shall be deemed modified to conform with such laws and the remaining provisions shall remain in effect.

20. Any claim or controversy in connection with, arising out of, or relating to the Agreement between Dealer and Cornwell shall be settled by binding arbitration in accordance with the rules pertaining to commercial dispute arbitration then existing with the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Such arbitration shall take place in such locations as the parties mutually agree, and in the absence of such agreement, in Akron, Ohio. The laws applicable to the arbitration procedure shall be the laws of the State of Ohio. The award of the arbitrator(s) shall be the sole remedy between the parties regarding any claims, counterclaims, issues presented or pled to the arbitrator(s).

Cornwell reserves the right to obtain injunctive relief from the act or omission of any activity prohibited or required by this Agreement in any court having jurisdiction, when such act or omission will cause irreparable harm to Cornwell.

21. Any notice required to be given under this Agreement or service of process for the purposes of arbitration or litigation of issues arising out of it, shall be given to Cornwell at 667 Seville Road, Wadsworth, Ohio 44281 and to Dealer and Dealer's Spouse, if applicable, at the address or addresses last provided by them to Cornwell. Service on Cornwell, Dealer, or Dealer's Spouse shall conclusively be deemed to have been completed for all purposes if made by regular U.S. mail or any other usual and reliable form of delivery to the address last given. The parties will continue to have the obligation to notify one another of any change of address during and after the termination of this Agreement, if they wish to be assured of the receipt of notices and service of process, and they expressly waive any objection to notice provided or service made to the last address they have given.

6

**IN WITNESS WHEREOF**, Cornwell and Dealer have set their hands to duplicates hereof at Wadsworth, Ohio and _____ on the day and year first above written.

**WITNESSES:**

| | |
|---|---|
| _____ | _Robert Erl, Treasurer_ <br> CORNWELL (Corporate Officer) |
| _____ | _Myron "Troy" Thomas_ <br> DEALER SIGNATURE |
| _____ | Myron "Troy" Thomas <br> PRINT DEALER NAME |
| _____ | _Lisa Lynn Thomas_ <br> DEALER'S SPOUSE |
| _____ | Lisa Lynn Thomas <br> PRINT DEALER'S SPOUSE |

DFA0708

STATE OF _Ohio_ }
}SS:
COUNTY OF _Muskingum_ }

    **BEFORE ME**, a Notary Public in and for said County and State, personally appeared the above-named _Myron Troy Thomas + Lisa Lynn Thomas_ who acknowledged that he/she did sign this and the same is his/her free act and deed.

    **IN TESTIMONY WHEREOF**, I have hereunto set my hand and official seal at _____, _____ the _15th_ day of _July_, 20_09_.

(SEAL)

_Brandy R. Hiles_
NOTARY PUBLIC
_my com. exp 4/18/10_

7





February 22, 2016

Myron Troy Thomas
dba Thomas Tool Supply
1393 Potts Lane
Zanesville, OH 43701

Via: USPS Priority Mail Express
(copies via standard USPS First-Class Mail)

Dear Troy:

This letter will serve as formal notification of the termination of your Cornwell Dealer Franchise Agreement as of the date stated below. The reason for the termination is as follows:

FAILURE TO MAINTAIN THE INVENTORY PURCHASE LEVELS REQUIRED IN THE AGREEMENT. IN 2016 YOU HAVE PURCHASED (-$1,193.22) WITH AN YTD WEEKLY PURCHASE AVERAGE OF (-$170.46) THROUGH WEEK #7 OF THIS YEAR, WHILE THE REQUIRED MINIMUM PURCHASE AVERAGE THROUGH WEEK #7 OF 2016 WAS $3,269.52 ($4,086.91 x 80%).
IN 2015 YOU PURCHASED $18,010.20 WITH AN YTD WEEKLY PURCHASE AVERAGE OF $346.35 THROUGH WEEK #52, WHILE THE REQUIRED MINIMUM PURCHASE AVERAGE THROUGH WEEK #52 OF 2015 WAS $3,432.61 ($4,290.76 x 80%).

This termination will be effective on March 28, 2016 unless you have cured your default by making the required additional purchases.

If you desire to return tools, this should be done in one shipment and must be received by Cornwell by April 28, 2016. **Please reference RMA 46901 on your tool return so your return can be processed.** Enclosed is a "New Tool Return Policy" you should follow to return your tools. They should be shipped freight prepaid to:

Cornwell Quality Tools Company
635 Seville Road
Wadsworth, OH 44281
Attn: Returns Dept.

This termination also necessitates the removal of all **Cornwell identifying decals, etc.** from your truck, clothing, business cards, stationery and other items used in your business with the public.

Please be advised as a result of this termination that your access to the MM1 computer system using access codes provided by Cornwell will cease as of April 5, 2016. In order to continue access to the MM1 software or to receive instructions on how to access your business data outside the MM1 system, you must contact Classic Computers at 630-550-5400 for assistance.

You should take notice that you may have rights concerning this termination under the laws of Ohio. To the extent that such laws conflict with the terms of this letter, those laws will prevail over this letter. You may accordingly wish to consult with an attorney concerning this termination.

Sincerely,
**CORNWELL QUALITY TOOLS CO.**

Robert A. Studenic
President and COO

RAS/ssh

Enc.

cc: K. Fischer, R. Fitzhugh, D. Columbus, BJ Templeton, C. Bloch, L. Nolan, S. Cleckner, M. Gregory, K. Myers, Returns Dept.



EXHIBIT



**ND-2**

**NEW TOOL RETURN POLICY**

A.   NO NEW TOOLS SHOULD BE RETURNED WITHOUT WRITTEN AUTHORIZATION FROM CORNWELL.

If a Dealer initiates the return request, each request should list the tools for which authorized return is requested. A copy of the request will be returned to the Dealer approving or disapproving the items. The Dealer should return no tools, which have been disapproved.

B.   NEW TOOLS WILL BE APPROVED FOR RETURN ONLY IF THEY ARE IN NEW AND SALEABLE CONDITION, ARE LISTED IN THE CURRENT PRICE SHEET AND ARE NOT TO BE DISCONTINUED BY CORNWELL. ALL RETURNED PRODUCT MUST BE OF CURRENT DESIGN AND FINISH. ALL TOOLS RETURNED MUST BE IN THEIR ORIGINAL INDIVIDUAL CARTON OR CONTAINER. BROKEN PACKS OF CORNWELL OR CORNWELL-ALLIED TOOLS WILL NOT BE ACCEPTED FOR RETURN IF THE TOOLS ARE NORMALLY SOLD BY CORNWELL IN FACTORY PACK QUANTITIES. THE FOLLOWING ITEMS ARE **NOT** SUBJECT TO RETURN UNDER THIS PROGRAM: TOOL BOXES, SOCKET TRAYS, CLIPS AND RAILS, VINYL KIT BAGS, AIR COMPRESSORS, PARTS WASHERS, SALES ADMINISTRATION OR TRUCK DISPLAY AIDS, WELDERS, BATTERY CHARGERS, AND SERIAL NUMBERED TEST EQUIPMENT.

C.   ALL AUTHORIZED RETURN SHIPMENTS MUST BE SHIPPED FREIGHT PREPAID TO:
Cornwell Quality Tools Company, 635 Seville Road, Wadsworth, Ohio 44281

D.   A 15% RESTOCKING CHARGE WILL BE APPLIED IN ALL CASES EXCEPT:

1.   Tools returned because of shipping error, providing authorized return requested within thirty (30) days of shipping date.

E.   CORNWELL RESERVES THE RIGHT TO RETURN NEW TOOLS FREIGHT COLLECT WHICH ARE RETURNED TO CORNWELL FOR CREDIT WITHOUT WRITTEN AUTHORIZATION.

F.   **IF VENDOR WILL ACCEPT SPECIAL ORDER NEW RETURN THEN THE "SPECIAL ORDER NEW RETURN CHARGES" WILL APPLY ($15.00 CHARGE PLUS FREIGHT TO VENDOR AND VENDOR RESTOCKING CHARGES IF APPLICABLE). DEALER WILL BE BILLED FOR THE ABOVE CHARGES THROUGH OUR RETURNS DEPARTMENT.**

G.   **ALL AUTHORIZED NEW TOOL RETURNS WILL BE CREDITED AT THE PROMOTION PRICE (IF ONE EXISTS) ON THE EFFECTIVE DATE OF THE RETURN UNLESS SPECIFICALLY ASSOCIATED WITH A SALES ORDER. THIS INCLUDES BROKEN TOOL RETURNS AS WELL.**

H.   USE BLACK (REP-3) PRODUCT RETURN LABELS FOR NEW TOOL RETURNS.



# RODERICK LINTON
# BELFANCE LLP
*Attorneys at Law*

FOUNDED 1885

**ROBERT M. GIPPIN**
ATTORNEY AT LAW
EMAIL: RGIPPIN@RLBLLP.COM
DIRECT DIAL: (330) 315-3400

April 19, 2016

<u>By Federal Express</u>

Myron T. Thomas
1393 Potts Lane
Zanesville OH 43701

Re:  Infringement of Cornwell Trademarks

Dear Mr. Thomas:

We represent the Cornwell Quality Tools Company.  It has come to Cornwell's attention that you have infringed Cornwell's registered trademarks by failing to remove them from your truck following your termination, despite Cornwell's notice at that time that you should remove them.

The name "Cornwell," the "Tool Array" and "Ironman" logos, the "Blue Stripe" and the phrase "The Choice of Professionals" all appear on your truck in the photographs we have received. You must immediately and completely remove those Cornwell registered trademarks from your truck and from any clothing, cards, letterhead or other places where they appear.

You must understand that Cornwell will vigorously defend its trademarks.  That is particularly true since we understand that you are continuing to do business holding yourself out as a Cornwell dealer, falsely implying a connection.  Unless we have evidence that you have removed the trademarks, we will not delay to file a lawsuit in federal court to obtain an injunction and costs, including attorney fees, as we have done in the past for similar violations.

We must receive your response within ten days of the date of this letter.

Very truly yours,

ROBERT M. GIPPIN

**EXHIBIT**
C

*Excellence is our tradition.*
AKRON · MEDINA



